## Appeal of ADAMS MOTOR CO.

Docket No. 3522.   Decided July 30, 1926.

The proof that patent rights paid in to a corporation in 1912 in exchange for $15,000 " special " capital stock had no actual cash value in 1919, does not entitle the taxpayer to deduct from gross income of the year 1919 the amount of $15,000 under the circumstances stated herein.

*George E. H. Goodner, C. P. A.*, for the petitioner.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

Before LITTLETON, SMITH, and TRUSSELL.

This appeal is from the determination of deficiencies in income and profits tax for the years 1918, 1919, and 1920, in the amounts of $7,857.92, $7,148.52, and $4,633.89, respectively, arising out of the action of the Commissioner in (1) revising the inventories as computed by the taxpayer for each of the years in question; (2) disallowing a loss deduction of $15,000 taken by the taxpayer in its return for the year 1919; and (3) reducing the invested capital claimed by the taxpayer for the years 1918 and 1919 by the amounts of $7,500 and $15,000, respectively.

### FINDINGS OF FACT.

The taxpayer, an Alabama corporation with its principal office at Mobile, was organized in or about the month of November, 1912,

under the name of the Adams Machinery & Manufacturing Co., with an authorized common capital stock of $30,000 par value, consisting of 300 shares of the par value of $100 per share, for the purpose of engaging in the manufacture and sale of machinery and farm implements. In or about the year 1920, taxpayer's name was changed to Adams Motor Co.

On July 13, 1909, and on July 20, 1909, United States Letters Patent Nos. 927,919 and 928,835, respectively, were issued to W. J. Adams, covering his two inventions, known as the Adams Lucky Trucker Manure Distributor and the Adams All-Steel Fertilizer Distributor. Aside from the construction of a few demonstrators, nothing was done by Adams in the way of development and exploitation of these patents until the organization of the taxpayer corporation in or about the month of November, 1912. Immediately upon taxpayer's organization, the patents in question were acquired by it for a consideration of capital stock of the par value of $15,000; the remaining capital stock being sold for cash at par. The actual cash value of these patents was not a determining factor in reaching a conclusion as to the amount of capital stock to be issued therefor, it being the intent of all the parties at interest that said Adams should be, at all times, the owner of one-half of the issued shares of petitioner's capital stock, in order that control might be vested in him. Section 10 of taxpayer's certificate of incorporation provides as follows:

One Hundred and Fifty shares of the stock subscribed for by W. J. Adams as hereinabove shown are to be paid for by the said Adams conveying to the company the right to manufacture and sell the articles and territory covered by two certain patents issued to William J. Adams, one numbered 927,919, and dated July 13th, 1909, and the other numbered 928,835, and dated July 20th, 1909, and the further right to dispose of the privilege, license or right to use the said patents in any territory covered by the same. The said One Hundred and Fifty shares of stock, or so much thereof as may be issued shall always be so kept and identified upon the records of the company that the same may be separated from the other stock of the company no matter into whose hands it may pass. Whenever the said company shall finally abandon the manufacture and sale of the articles covered by the aforesaid patents such abandonment shall be tantamount to the payment to the then holders of the issued portion of said one hundred and fifty shares of stock the par value thereof, provided that the said stock be worth more than par, and shall effect a retirement and cancellation of said shares provided that the said stock be worth not more than par. Should the said stock be worth more than par at the time that the aforesaid abandonment takes place, then the holders thereof shall stand in the same position as though they had drawn upon the said stock a dividend of one hundred per cent, and they shall receive no further dividends thereon until all of the other stock of the company has received a dividend in like amount in money or its equivalent. All certificates which may be issued to evidence all or any portion of said one hundred and fifty shares of stock shall contain something to call attention

to the fact that the Company's records will reveal a special arrangement with respect to said shares. It is the purpose of the undersigned incorporators that the stock to be issued in payment for the aforesaid rights shall always equal the amount of that portion of the capital stock sold for cash, and therefore they agree that one hundred and fifty shares shall be now issued to W. J. Adams, and that one share of stock shall be issued to the said W. J. Adams whenever the capital stock of the Company is increased and one additional share of stock is sold and issued. It is further agreed that for each share of additional stock sold and issued by the company at any time in the future, there shall be issued to the said Adams an additional share of special stock. It is the purpose and agreement of all parties hereto that the stock to be issued to W. J. Adams in payment for said rights shall represent a half interest in this company and as often and whenever the company is authorized to increase its capital stock and a share is sold and issued for cash, then a share must issue to said W. J. Adams, his heirs or assigns. Such shares must be identified as above stated and be subject to the retirement and cancellation provisions herein before written.

In addition to the capital stock issued to him for his patents, Adams acquired for cash 100 shares, which made him the owner of more than 50 per centum of taxpayer's authorized and outstanding capital stock.

In 1910 or 1911, Adams received an offer of $25,000 cash for a controlling interest in his patents, which offer he rejected, as it was his intention to manufacture and sell the patented articles, it being his belief at the time that the revenue to be derived from the manufacture and sale of those articles would be much greater than the cash offer.

Immediately upon acquiring these patents, the taxpayer commenced the manufacture of the articles covered thereby. Operations were conducted entirely by hand in blacksmith shops, the company being without the necessary funds to erect and equip a plant. Approximately 50 machines were manufactured and sold up to 1916, when operations were discontinued because the petitioner found it impracticable profitably to compete with other manufacturers of similar articles, who were manufacturing their products under more favorable circumstances in modern and well equipped plants. In 1918 the officers and directors again considered the proposition of building a plant for the manufacture of the aforementioned patented articles, but found that, due to the increased costs of material and labor, the necessary building and equipment would cost approximately $300,000, a sum considerably in excess of any available funds plus the taxpayer's borrowing capacity. In a directors' meeting held on August 14, 1918, consideration was given to the abandonment of the patents, but Adams prevailed upon the board of directors to reassign the patents to him in order that he might make further effort either to sell the patents or to have the patented articles manufactured by others on

a royalty basis, in consideration for which Adams executed his non-interest bearing promissory note, in the sum of $15,000, in favor of the taxpayer. At a meeting of the stockholders held on the same date the following resolution was adopted:

At a meeting of the undersigned stockholders of the Adams Machinery and Manufacturing Company, Inc., it was decided that the patents and rights of the Adams Lucky Trucker now owned by the Adams Machinery and Manufacturing Company, Inc., be sold by the said company to Mr. W. J. Adams and Mr. L. G. Adams for the amount of $15,000, same being the purchase price of said patents and rights sold to the Adams Machy & Mfg. Co., Inc., originally by W. J. Adams and L. G. Adams. Furthermore that the Adams Machy & Mfg. Co. Inc. at the time of purchase of said patents and rights paid for same in stock, said stock being a special stock which was divided as follows:

Stock Certificate #4 issued to W. J. Adams to the amount of 100 shares, and stock certificates #5 issued to W. J. Adams, and transferred to L. G. Adams to the amount of 50 shares; this stock was to bear dividends but not to be considered a par value stock.

Now the Secretary is ordered to transfer this said special stock to W. J. Adams and L. G. Adams, and new certificates be issued for same, said stock after issuance to be par value stock and worth as much in every way as any other stock of the Adams Machy & Mfg. Co. Inc.

Subsequently, Adams made every effort to sell the patents or to have the patented articles manufactured upon a royalty basis, but such efforts were unsuccessful. It was understood and agreed among the stockholders and directors that the taxpayer was not to make any demand upon Adams for the payment of the note given by him in consideration of the reassignment of the patents to him by the taxpayer, and that, in the event he was successful in selling the patents or having the patented articles manufactured upon a royalty basis, he would liquidate the note out of any revenues so derived. Finally, on December 31, 1919, at a special meeting of the stockholders, the following resolution was adopted:

Resolved, that in consideration of W. J. Adams and L. G. Adams reconveying all their right, title and interest in patents #927,919, dated July 13th, 1909, and #928,823, dated July 20th, 1909, to this Company, that this Company do return to said W. J. Adams and L. G. Adams the notes aggregating $15,000, given by said W. J. Adams and L. G. Adams for said patents. Resolved further that the Officers of this Company are hereby directed to take such steps as may be necessary to effect the object of this resolution.

Then followed the adoption of a further resolution, which provided as follows:

That all outstanding Stock shall be of Equal Value; that effective this date, no more " Special Stock " exist and all outstanding Stock shall be known as " Capital Stock," having equal rights and equal value; that, this amends Article X of the Certificate of Incorporation.

In pursuance of the foregoing resolutions, Adams reassigned the patents to the taxpayer, which in turn returned to him his note for

$15,000. Immediately thereafter the board of directors directed that the patents be charged off on the books as worthless.

Nothing took place between November, 1912, when these patents were acquired by the taxpayer, and March 1, 1913, which served either to enhance or decrease whatever value they may have had at the time of acquisition.

In computing its invested capital for the year 1918, the taxpayer included the aforementioned patents in the computation at a value of $7,500, said amount representing 25 per centum of the par value of the capital stock outstanding at the beginning of the taxable year. For the taxable year 1919, the taxpayer included the note of Adams, given in exchange for the patents, in the computation of invested capital, at its face value, $15,000. In computing its taxable net income for the year 1919, petitioner took a deduction of $15,000, as representing the loss sustained upon the abandonment of the patents. The Commissioner has disallowed any value for the patents or for the note of Adams in his redetermination of the invested capital for the years 1918 and 1919, respectively; and has disallowed the loss deduction taken by the petitioner in the return for the year 1919 on account of the abandonment of the patents.

Some time after its organization and the commencement of business, the taxpayer secured an agency contract for the sale of Ford automobiles and certain lines of heavy machinery, which contracts were in full force and effect throughout all of the years in controversy. It was the practice of the taxpayer to accept used cars in part payment for new cars or such used cars as it offered for sale. Used cars so accepted in part payment were entered upon the taxpayer's books of account at their "trade-in" value and were so carried until the close of the year, at which time they were personally inspected by taxpayer's president and general manager, who placed a value on each used car, which values, in his opinion, represented their selling values. These values, which were used by the taxpayer for inventory purposes, in computing its taxable net income for each of the years in question, were less than the "trade-in" values, or cost, by the following amounts: For 1918—$6,972.38; for 1919—$7,170.22; and for 1920—$6,825.91. The Commissioner has restated the values of used car inventories on the basis of their "trade-in" values, or cost, and has adjusted the net income of each of the years in controversy accordingly.

For each of the years in controversy, the taxpayer first valued its inventories of accessories, tires and tubes, and miscellaneous spare parts at list prices, less trade discounts according to terms of agency contracts. From the sums so obtained it deducted approximately 10 per centum thereof to take care of obsolete and damaged goods

included in the inventories, the amounts of such deductions being as follows: For 1918—$2,129.76; for 1919—$1,886.26; and for 1920—$3,687.97. In each instance the Commissioner has increased the inventories by the amounts of the 10 per cent deductions, and has adjusted the net income of each of the years in controversy accordingly.

On December 31, 1920, taxpayer had on hand certain tractors and implements which had been acquired during the current year at prices which were in excess of their replacement values at that date. For income-tax purposes the taxpayer valued these items at their replacement values, the total of which was $2,422.12 less than their actual cost. The Commissioner has restated the inventory of tractors and implements at cost, and has recomputed the net income for 1920 accordingly.

The result of the Commissioner's several adjustments of the inventories outlined above is to increase or decrease the net income of each of the years in controversy as follows:

| | |
|---|---|
| 1918 | $9,102.14 (increase) |
| 1919 | 45.66 (decrease) |
| 1920 | 3,879.52 (increase) |

## OPINION.

SMITH: (1) The first question presented is whether the patent rights paid in to a corporation in 1912 in exchange for $15,000 "special" capital stock had a cash value in 1912, which cash value was lost in 1919. The evidence indicates that the value of the patent rights was problematical. The inventor had received an offer for a controlling interest in the patents in 1910 or 1911 of $25,000 and had rejected it. The rights were turned in to the corporation under an agreement whereby 50 per centum of the capital stock was to be issued for the rights and designated as "special" capital stock, and 50 per centum of any increase in the number of shares of capital stock outstanding should be received by the inventor as a part of the consideration for those patent rights. Section 10 of the taxpayer's certificate of incorporation provided in part:

10. * * * The said One Hundred and Fifty shares of stock, or so much thereof as may be issued, shall always be so kept and identified upon the records of the company that the same may be separated from the other stock of the company no matter into whose hands it may pass. Whenever the said company shall finally abandon the manufacture and sale of the articles covered by the aforesaid patents such abandonment shall be tantamount to the payment to the then holders of the issued portion of said one hundred and fifty shares of stock the par value thereof, provided that the said stock be worth more than par, and shall effect a retirement and cancellation of said shares provided that the said stock be worth not more than par. * * *

It is apparent from the foregoing that the patent rights were not to be a charge against the entire capital stock of the corporation

but only against certain shares of stock that were to be specially issued therefor.  The taxpayer found that the manufacture of the patented articles was unprofitable and could not be made profitable, and very shortly after incorporation the manufacture of them was discontinued.  The special stock, however, was not immediately returned to the inventor.  In 1918, the special stock was replaced by shares of capital stock which had the same status as the shares of stock not specifically issued for the patents.  We are of the opinion that the evidence does not warrant a finding that the patent rights had any cash value in 1912, and we are furthermore of the opinion that the taxpayer sustained no loss in 1919 as a result of any discovery that the patent rights were worthless.

(2) The taxpayer took its inventories of new cars, tractors, and implements on the basis of cost or market, whichever was lower.  Its inventory of used cars was taken on the basis of market values which were uniformly less than the "trade-in" values.  In the absence of evidence that the inventories of used cars were taken at more than the market the taxpayer's determinations of such market values are approved.  At the hearing of this case a witness for the taxpayer was asked as to how all the inventories of accessories and items were taken.  His answer was:

A. Well, accessories; there are always new accessories coming out, and the ones that we have become obsolete and out of date, and we cannot sell them always when the new things come out, and naturally we have to consider that we have some of these which are shop worn, especially tires and tubes and things of that sort, but especially tires, as there are different sizes, different sizes of wheels; the wheels are being changed every year by the automobile business, different sizes coming out, and this makes quite a difference in the size of the tire, so that naturally the tires that we have on hand become obsolete and deteriorate.

Q. How did you price your inventory on accessories and miscellaneous items?

\*     \*     \*     \*     \*     \*     \*

A. We take the regular inventory price less the discount, we would discount the cost, then we would go over the whole inventory, make a summary of all of the different items that we thought were right, and take a depreciation for this amount.  In this instance, we arrived at about 10 per cent, which really will not cover it.

We are not convinced from this testimony that the accessories inventory was taken upon the basis of cost or market, whichever is lower.  Manifestly, obsolete goods which had no sale value should not have been included in the inventory.  A deduction from total inventory based upon an estimate of the decrease in value of the total inventory by reason of the inclusion therein of obsolete and shopworn goods does not necessarily result in bringing the inventory to cost or market, whichever is lower.  Upon the record before us, we think that the Commissioner was justified in adding to the ac-

cessories inventory at the close of the years 1918, 1919, and 1920, $2,129.76, $1,886.26, and $3,687.97, respectively, on account of such depreciation made by the taxpayer. *Appeal of Farmers' Hardware Co.*, 2 B. T. A. 90; *Appeal of Pleasant Valley Ranch Co.*, 2 B. T. A. 335; *Appeal of Alexander Reid & Co.*, 2 B. T. A. 425; *Appeal of J. Van Lindley Orchard Co.*, 2 B. T. A. 1084.

> *Order of redetermination will be entered on 15 days' notice, under Rule 50.*